AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
04/20/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___dj___ DEPUTY

United States of America

v.

FRANK LINK ALMANZA,

Defendant.

Case No. 2:21-MJ-1956

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 6, 2021, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/S/ Brian Sullivan
*Complainant's signature*

Brian Sullivan, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: April 20, 2021

*Judge's signature*

City and state: Santa Barbara, California

Hon. Louise A. LaMothe
*Printed name and title*

**AFFIDAVIT**

I, Brian Sullivan, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Frank Link ALMANZA ("ALMANZA") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2. This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES") in the custody of the Federal Bureau of Investigation, in Santa Maria, California, as described more fully in Attachment A:

    a. A white iPhone 8 with Otter Box case ("SUBJECT DEVICE 1"); and

    b. A metallic blue Samsung Smartphone ("SUBJECT DEVICE 2").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.   I am a Special Agent ("SA") employed with the Federal Bureau of Investigation ("FBI") assigned to Los Angeles Field Office, Santa Maria Resident Agency.  I have been employed with the FBI since January 2003.  I have received specialized training in narcotics trafficking and money laundering from the FBI.  I have been personally involved in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, methods used to finance drug transactions, methods of distribution, and movement of drug proceeds.  I have had numerous conversations regarding these subjects with other law enforcement officers.

6.   I am familiar with the methods of operation utilized by drug traffickers and drug trafficking organizations, including the distribution, storage, and transportation of narcotics, and the collection of monetary narcotics proceeds.  I am also familiar with methods employed by large drug organizations to thwart detection by law enforcement, including the use of debit calling cards, public telephones, cellular telephone technology, mobile applications, electronic

messenger/messaging systems, voice over internet phone technology, pagers, counter surveillance, encrypted devices, false, fictitious, or stolen identities, and coded communications. In conducting investigations with FBI, I have debriefed defendants, informants, and witnesses who had personal knowledge regarding narcotics trafficking organizations and the methods in which these organizations operate. I have also participated in various aspects of these investigations, including making and directing controlled purchases of dangerous drugs, conducting physical and electronic surveillance, using informants and cooperating human sources, executing search warrants, executing arrest warrants, participating in consensual searches, installing and utilizing GPS devices, and installing and utilizing electronic recording devices. I have used a variety of investigative techniques and resources, including surveillance, confidential human sources, search warrants, telephone toll analysis, and wire/electronic intercept communications analysis. Prior to my employment with the FBI, I was a Captain in the United States Army, where I served five years on active duty.

### III. SUMMARY OF PROBABLE CAUSE

7. On March 31, 2021, while performing routine patrol responsibilities at the Chumash Indian Casino in Buellton, California, Santa Barbara Sheriff's Deputies contacted and arrested Frank Link ALMANZA with a large quantity of suspected methamphetamine, heroin, and other drug-related paraphernalia. At the time of ALMANZA's arrest, two cellular telephones (the

SUBJECT DEVICES) were found and seized from ALMANZA and the passenger of his car, Vanessa Rene VASQUEZ.

## IV. STATEMENT OF PROBABLE CAUSE

8. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. Sheriff Deputies are alerted to VASQUEZ's vehicle, parked in the Chumash Casino parking structure.

9. On March 31, 2021, Santa Barbara Sheriff's Deputies were performing routine foot patrol of the parking structure attached to the Chumash Indian Casino located in Buellton, California. While on patrol, the Deputies were alerted to a suspicious vehicle parked in the structure. Upon closer examination of the vehicle, the Deputies observed, through the un-tinted and partially opened passenger's side window, various items of drug paraphernalia.

10. The Deputies performed a law enforcement database search of the suspicious vehicle and learned it was registered in the state of California to Vanessa Rene VASQUEZ, who resides in Santa Maria, California. The search also revealed VASQUEZ was on active Post Release Community Supervision (PRCS) out of the county of Santa Barbara with full search terms.

11. VASQUEZ was unable to be located near her vehicle or within the casino until approximately 30 minutes later, when casino security notified the investigating Deputies that a white Chevrolet Suburban appeared to be dropping VASQUEZ off at her

4

vehicle.  Deputy Louis Tanore and Sergeant Seth Woodill proceeded back to VASQUEZ's vehicle for follow-up investigation.

      **B.   Deputies contact VASQUEZ and ALMANZA and conduct a search of ALMANZA's vehicle.**

    12.  Deputy Tanore approached the Suburban's passenger side door and contacted VASQUEZ between the passenger's side door and her vehicle located approximately six feet away.  As Deputy Tanore spoke with VASQUEZ, he observed a strong odor of vinegar emanating from the Suburban.  Based on Deputy Tanore's narcotics training and experience, he is aware this smell is often associated with heroin.  Deputy Tanore also observed, in plain view, a small glass jar near the center console of the car.  Inside the jar, Deputy Tanore observed what appeared to be a small baggie containing a large black ball.  Based on Deputy Tanor's narcotics training and experience, he believed the substance to be consistent with heroin.

    13.  Sergeant Woodill approached the Suburban's driver's side door and spoke to the driver, later identified as ALMANZA, and VASQUEZ through the open window.  Sergeant Woodill asked VASQUEZ if her name was Vanessa VASQUEZ, and she became defensive while answering in the affirmative.  During Sergeant Woodill's questioning, he too observed a strong smell of vinegar emanating from the Suburban and observed ALMANZA displaying signs and symptoms of being under the influence of narcotics.  Sergeant Woodill also observed in plain view the small glass jar near the center console of the car.  Based on Sergeant Woodill's

5

narcotics training and experience, he too believed the substance and odor to be consistent with heroin.

14. During Sergeant Woodill's interaction with ALMANZA, VASQUEZ quickly closed the passenger door of the Suburban and began walking toward her car, leaving behind her purse and other various items of property in the Suburban. Sergeant Woodill asked ALMANZA to exit the car, which he did after initially resisting and reaching near the center console. Sergeant Woodill detained ALMANZA and retrieved the glass jar, which contained approximately 52.4 grams of suspected heroin.

15. Sergeant Woodill conducted a pat down search of ALMANZA incident to his arrest. During the search, Sergeant Woodill found in ALMANZA's pocket a white iPhone 8 with an Otter Box case (SUBJECT DEVICE 1), which Sergeant Woodill seized.

16. After ALMANZA was detained, Deputy Ehren Rauch and Sergeant Woodwill conducted a search of the Suburban. During the search, Deputies located a blue duffle bag on the back seat containing approximately 2,006.7 grams of suspected methamphetamine, a second container containing approximately 91 grams of suspected heroin, a plastic container with approximately one pound of suspected marijuana, various narcotics packaging material, and two digital scales.

17. Upon completion of the search, a post-<u>Miranda</u> interview was conducted by Deputy Tanore. ALMANZA immediately invoked, and the interview terminated.

18. After officers found the suspected narcotics in ALMANZA's vehicle, Deputy Tanore asked VASQUEZ what her

6

relationship to ALMANZA was.  VASQUEZ stated she had nothing to do with his car and had just met ALMANZA in the casino.  VASQUEZ said she had recently left with him from the casino to have sex in his car.  VASQUEZ asked Sergeant Woodill if she could have her phone, which was still in the Suburban.  Officer Woodill found a blue Samsung smartphone (SUBJECT DEVICE 2) on the front passenger seat of the car, which VASQUEZ confirmed belonged to her.  Deputy Tanore asked VASQUEZ if SUBJECT DEVICE 2 contained any messages related to the sale of narcotics.  VASQUEZ unlocked SUBJECT DEVICE 2 and consented to a search under the terms of her PRCS probation.  During an initial review, Deputy Tanore observed a series of text messages between VASQUEZ and another individual identified in the phone as "frankie" (suspected to be Frank ALMANZA).  The text messages included references to "black shoes" and "credit for speakers," which, based on my training and experience, I believe to be coded language for drug trafficking.

19. On April 13, 2021, the suspected narcotics, the SUBJECT DEVICES, and other various items of evidence were taken into custody of the FBI located in Santa Maria, California.  The suspected methamphetamine was weighed and presumptive field tested using a NARK II test, which returned a positive result for methamphetamine and a gross weight of 2,006.7 grams.

20. On April 14, 2021, the suspected methamphetamine and suspected heroin were shipped to the Drug Enforcement Administration Southwest Laboratory for further testing.  These results are still pending.

7

21. As a result of this activity, ALMANZA was arrested for the sale and possession of methamphetamine and heroin, and VASQUEZ was cited and released for the narcotic paraphernalia found in her car.

### V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

22. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

    c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the

seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

   d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

   e. Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

23. As used herein, the term "digital device" includes the SUBJECT DEVICES.

24. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

   a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained

in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

        b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    25.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

        a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

        b.    Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    26.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ALMANZA or VASQUEZ's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of

12

ALMANZA or VASQUEZ's face with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

27. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

28. For the reasons described above, there is probable cause to believe that ALMANZA has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

/s/
Brian Sullivan, Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 20th day of April, 2021.

THE HONORABLE LOUISE A. LAMOTHE
UNITED STATES MAGISTRATE JUDGE
SANTA BARBARA, CALIFORNIA

13